# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Sonia Mertes, *Trustee for the Heirs and Next-of-Kin of Luke Capouch*,<br><br>Plaintiff,<br><br>v.<br><br>City of Rogers and Joseph Zerwas, Jr., *Individually, and in his Official Capacity*,<br><br>Defendants.[1] | Case No. 17-cv-4508 (SRN/SER)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Markus C. Yira, Yira Law Office, Ltd., PO Box 518, Hutchinson, MN 55350, and Julie W. Hanjani, Law Office of Julie Wacker Hanjani, 218 Main Street South, Suite 105, Hutchinson, MN 55350 for Plaintiff.

Tal A. Bakke, Joseph E. Flynn, and Pierre N. Regnier, Jardine Logan & O'Brien PLLP, 8519 Eagle Point Boulevard, Suite 100, Lake Elmo, MN 55042 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This case is about the tragic suicide of Luke Capouch, a promising young man from Elk River, Minnesota. Capouch took his own life shortly after being released from the Rogers Police Department, where he had been briefly detained following an arrest for shoplifting. Plaintiff Sonia Mertes (Capouch's mother) subsequently brought this lawsuit seeking to hold the City of Rogers accountable for Capouch's death. Specifically, Mertes alleges that certain

---

[1] In her complaint, Mertes named Daniel Rose and Jeffrey Beahen as defendants, too. However, on December 21, 2018, Mertes agreed to dismiss her claims against both parties. (*See* Doc. No. 45.)

threatening and abusive behavior exhibited by one of the City's police officers, Defendant Joseph Zerwas, Jr., during Capouch's time at the police station led Capouch to take his own life. Zerwas, along with his co-Defendant, the City of Rogers, now move for summary judgment. Mertes opposes the motion.

The Court is deeply sympathetic to Mertes's plight. However, because there is no evidence that Zerwas, or any of the officers who encountered Capouch during his arrest, knew (or could have known) that Capouch was at risk of committing suicide after he left the police station, the law forbids holding Zerwas (and, by extension, the City of Rogers) liable for Capouch's subsequent decision to take his own life. Accordingly, the Court is dutybound to grant Defendants' motion, and to dismiss Mertes's complaint with prejudice.

## I. BACKGROUND

### A. Factual Background

#### 1. *The Parties*

At the time of his death, Luke Capouch ("Capouch") was a 19-year-old high school graduate who had just started working as a train conductor for the Canadian Pacific Railway. (*See* Capouch Incident Rep. [Doc. No. 50-3] at 1 (Capouch's age); J. Capouch Dep. [Doc. No. 49-4] at 33 (Capouch's graduation status); H. Mertes Dep. [Doc. No. 49-5] at 47-48 (Capouch's occupation).) He was, by all accounts, a happy, humorous, and well-liked young man. (*See generally* S. Mertes Dep. [Doc. No. 49-6] 22-23, 29-33 (Capouch's mother); H. Mertes Dep. at 36-37 (Capouch's father-in-law); J. Capouch Dep. at 31-33 (Capouch's biological father); Bandescu Dep. [Doc. No. 49-7] at 9-11 (Capouch's friend); Patka Dep. [Doc. No. 49-8] at 11-13 (Capouch's friend); Patterson Dep. [Doc. No. 49-13] at 12-13

(Capouch's friend).) In fact, at their depositions, Capouch's close friends and family uniformly testified that, as far as they knew, Capouch had never exhibited depressed or suicidal tendencies at any point over the course of his life. (*Id.*) However, it appears that, during the year or two before his death, Capouch gambled more than he should have, which occasionally left him short off money. (*See, e.g.*, J. Capouch Dep. at 113-14; Patterson Dep. at 9-10.)

Defendant Joseph Zerwas, Jr. worked as a police officer for Defendant City of Rogers for approximately fourteen years, from some point in 2001 through February 26, 2015. (*See* Zerwas Dep. II [Doc. No. 55-1] at 7.) He now works as a part-time officer for the City of Corcoran. (*Id.* at 8.) During his time working for the Rogers Police Department, Zerwas, like all his fellow Rogers police officers, received training in "recognizing warning signs of suicide risk." (*Id.* at 28-33; *see also* Beahen Dep. [Doc. No. 49-3] at 31-34 (describing department-wide training).) At the time of the Capouch incident, Officer Zerwas worked alongside City of Rogers Police Chief Jeffrey Beahen and City of Rogers police officer Daniel Rose.

### 2. *The Arrest*

On October 22, 2014, at around 3:00 P.M., Officers Zerwas, Rose, and Beahen arrested Capouch for stealing clothes, including a $330 thermal jacket, from a Cabela's sporting goods store in Rogers, Minnesota. (*See generally* Capouch Incident Rep.) The Officers effectuated this arrest after a Cabela's security officer called 9-1-1 and informed the operator that he had personally witnessed Capouch commit the theft and then drive away in

a black Honda Accord. (*Id.*)[2] There is no dispute that Capouch committed this crime. In fact, when the Officers stopped Capouch and asked whether the Cabela's jacket he was wearing was his, Capouch did not deny culpability and instead simply stated, "no you can take the jacket, I don't care, arrest me." (*Id.* at 4.)

After placing Capouch under arrest for gross misdemeanor theft, *see* Minn. Stat. § 609.52, the three officers parted ways: Chief Beahen went to the Cabela's to further investigate the theft(s),[3] Officer Zerwas stayed with Capouch's Honda Accord to assist with the vehicle's impoundment, and Officer Rose drove Capouch to the nearby Rogers police station to "book," *i.e.*, make a record of, Capouch's arrest. (*See generally* Capouch Incident Rep.) Nothing of note occurred during Officer Rose's drive back to the police station. (*See generally* Officer Rose Police Squad Car Video [Doc. No. 50-1].)

Capouch's booking process lasted approximately 45 minutes. (*See generally* Booking Room Video [Doc. No. 50-2].) For the most part, these 45 minutes were quiet and uneventful. That is, per the video evidence, most of Capouch's booking process consisted of either Officer Rose quietly typing information into his computer while Capouch sat nearby, or of Officer Rose taking Capouch's fingerprints while Capouch diligently followed the Officer's instructions. (*Id.*) However, two verbal exchanges of note took place during this time period:

---

[2] The security officer also informed the operator that Capouch had stolen goods from the store on at least two other occasions in the past six months. (*Id.*)

[3] After speaking with the Cabela's security officer and observing the in-house pictorial evidence, Chief Beahen confirmed that Capouch almost certainly committed the two prior thefts, too. (*See* Capouch Incident Rep. at 2-3.) Chief Beahen immediately relayed that discovery to Officer Rose. (*Id.* at 4.)

4

one brief exchange between just Capouch and Officer Rose at the beginning of the booking process, and another, more prolonged, exchange between Capouch and Officer Zerwas during the last ten minutes of Capouch's detention.[4]

*First*, at an early point in the process, Officer Rose off-handedly asked Capouch (while Rose was typing on a computer), "you just short on money, or you just wanted a jacket, or you just seeing if you can get away with this type of thing, or . . . ?" (*Id*. at 5:08.) Capouch calmly and casually replied, "I've got a little bit of a gambling problem, man. I've lost a lot of my money gambling and I didn't go there planning to steal anything. I was just trying to pass the time until I got called to work here, and yeah, I've just gotten away with stealing so much. [*Pauses*] You know what I mean?" (*Id*. at 5:15 – 5:36.)

Officer Rose did not further inquire into Capouch's "gambling problem" or follow up on this conversation in any substantial manner, and neither did Capouch.

*Second*, and more notably, Officer Zerwas made the following, arguably threatening, remarks to Capouch about his (recently achieved) employment with the Canadian Pacific Railway. *First*, around 30 minutes into the booking process, while Officer Rose was still taking Capouch's fingerprints, Officer Zerwas asked Capouch, "so you work for Canadian Pacific, huh?" (*Id*. at 33:36.) Capouch responded, "Yes sir." (*Id*.) Officer Zerwas then observed, "they're not going to like this too well, are they?" (*Id*.) Capouch responded, "I don't know." (*Id*.) Capouch then provided a few more details about his employment to Zerwas,

---

[4]  The first exchange was "just" between Capouch and Officer Rose because Officer Zerwas did not join Officer Rose in the booking room until approximately 15 minutes into Capouch's detention, after he had finished impounding Capouch's vehicle. (*See id*. at 19:30 (Officer Zerwas's entry).)

5

including the fact that he had only been working at Canadian Pacific for four months. (*Id.* at 34:15.)

*Second*, about five minutes later, while Officer Rose was typing at his computer and Capouch was sitting on a bench nearby, Officer Zerwas and Capouch got into the following tit-for-tat, which, for ease of reference, the Court will simply reprint in script form:

> **Zerwas:** [*Out of the blue*] Yeah, I know some people at Canadian Pacific. You might want to talk to somebody when you're there.
> **Capouch:** Who do you know?
> **Zerwas:** People you don't know.
> **Capouch:** Yeah?
> **Zerwas:** Believe me, yeah.
> **Capouch:** [*Laughs*]
> **Zerwas:** Seriously.
> **Capouch:** Who do you know then?
> **Zerwas:** That's none of your business. People, people that work there. But you'll find out. Once they find out about the charge, you won't be there any longer.
> **Capouch:** That's too bad.
> **Zerwas:** Yeah, they won't allow that.
> **Capouch:** You gonna call up your buddies and let them know?
> **Zerwas:** You wait and see.
> **Capouch:** [*Laughs*]
> **Zerwas:** You're stealing here, how do we know you're not stealing there?
> **Capouch:** What am I going to steal – a box car?
> **Zerwas:** No, not just a box car. I thought you said you do the whole train?
> **Capouch:** What am I going to steal – a whole box car? How am I going to get that in my house? There's nothing you can steal out of it. You don't know anything about railroads.
> **Zerwas:** Well, I guess you're right. [*Pauses*] You'd know.
> **Capouch:** Yeah, I would know.
> **Zerwas:** You've been there four months, you'd know.
> **Capouch:** I know, yeah, I know a lot more about railroads than you do.
> **Zerwas:** You should.
> **Capouch:** And I know a whole lot more people who work at Canadian Pacific than you do.
> **Zerwas:** I know a guy that just retired from there. Just retired. Just freshly. He's got a lot of connections with a lot of friends there. But keep your attitude up.

> That's not gonna make you win nothing. [*Pause*] You did it to yourself. Nobody did it to you.
> **Capouch:** Thank you. I'm sure you used that one before.
> **Zerwas:** Huh?
> **Capouch:** I'm sure you've used that one before.
> **Zerwas:** Ah well, yeah. Let me see. Maybe '94? Yeah, yeah you were still shitting yellow back then when I started at my job.
> **Capouch:** Exactly.
> **Zerwas:** You're right.
> **Capouch:** When you do get to retire after 30 years, then the taxpayers gotta pay your pension.
>
> [*Pause*.]

(*Id*. at 39:50 – 41:49.)[5]

After this exchange – during which neither Officer Zerwas nor Capouch substantially raised their voice or engaged in any physical contact with the other – the conversation turned to Capouch's car and Capouch's eventual court appearance. That is, Officer Zerwas first told Capouch he could collect his car at a nearby towing station called "Burda's," and Officer Rose then gave Capouch a form notifying Capouch that he needed to appear in court on December 2, 2014, and that a warrant would be issued for his arrest if he did not appear. (*See generally id.* at 41:56 to 45:55.) Capouch did not say or do anything of note in these final

---

[5] As a point of context, the Court notes that, contrary to Defendants' assertions in their briefing (*see* Defs.' Br. in Support of Summ. J. [Doc. No. 48] ("Defs.' Summ. J. Br.") at 7), it does not appear that Canadian Pacific would have been *required* to fire Capouch for committing a theft, per company policy. (*See* Cobb Aff. [Doc. No. 56] ¶ 3 (affidavit from Canadian Pacific human resources employee stating that "new hires" are only automatically fired if they steal "Canadian Pacific corporate property").) However, it is undisputed that, because Capouch was an at-will, probationary employee of Canadian Pacific, Canadian Pacific could have fired him for virtually any reason it wanted, including for committing a misdemeanor theft. (*See* H. Mertes Dep. at 47.)

minutes of detainment. Rather, he accepted the Officers' commands without protest and then left the police station to walk to Burda's. (*Id.*)

Importantly, it is undisputed that, over the course of Capouch's roughly hour-long arrest and detainment, Capouch did not engage in any behavior that would have suggested to a reasonable police officer that he was at risk of committing suicide. It is also undisputed that the Officers had no information within their possession that would have put them on notice of that risk. Not only did the Officers and defense expert provide testimony to that effect (*see* Rose Dep. [Doc. No. 49-1] at 59, 62; Zerwas Dep. I at 32; Groat Ex. Rep. [Doc. Nos. 51-1 to 51-2]), but Plaintiffs' own expert testified as such, too. (*See* Willenbring Rep. [Doc. Nol. 49-14] at 2 ("agreeing" with Defendants' expert, Dr. Groat, that Capouch "did not exhibit overt signs of mental illness while he was in police custody," and that Capouch "had no prior mental health history, had never talked about suicide to anyone, and [had] never attempted suicide in the past"); Willenbring Dep. [Doc. No. 49-11] at 19-20 ("Q: But there was certainly nothing that you could see as a psychiatrist [after viewing the booking room video] that would indicate to you that [Capouch] was inclined to commit suicide? A: No, there was not."); *see also* H. Mertes Dep. at 92-93 ("Q: [W]ould you have had any indication from watching that [booking room] video that [Capouch] was going to commit suicide? A: Not at all.").)

### 3. *The Suicide*

When Capouch arrived at Burda's he discovered that he could not retrieve his car (or his phone, which was inside his car) because he was not technically the owner of the vehicle (rather, his father-in-law, Hunter Mertes, was the owner). (*See* Carbert Dep. [Doc. No. 49-10] at 10 (testimony from one of the individuals who was working at Burda's that day).)

Admittedly, it is unclear who decided to apply this "ownership requirement" against Capouch. On the one hand, Officer Zerwas testified that this requirement was a Burda's policy, not a police department policy, and that there was nothing he could have done about it. (*See* Zerwas Dep. at 46.) In fact, Officer Zerwas explained at his deposition, he even recalled informing Capouch about this issue after the three parties walked out of the police station. (*Id.*) On the other hand, both Police Chief Beahen and Burda's owner, Lance Burda, testified that Burda's could waive its "ownership requirement" if a police officer called and requested that Burda's do so. (*See* Beahen Dep. at 43; Burda Dep. [Doc. No. 49-9] at 9.) However, it appears, Zerwas did not take that course of action here. (*Id.*)

Regardless of this narrow factual discrepancy, though, it is undisputed that, within two to three hours of leaving the police station, Capouch found himself at an Elk River railway crossing ten miles away from the station. (*See* Willenbring Rep. at 2; Capouch Incident Rep. at 5.) Once there, Capouch committed suicide by "striding into an oncoming commuter train." (Groat Rep. at 2; *see also* S. Mertes Dep. at 38-39 (acknowledging that Capouch's death was a suicide).) Capouch did not contact anyone before his death. (*See* J. Capouch Dep. at 123; S. Mertes Dep. at 20; H. Mertes Dep. at 37-38.)

### B. Procedural Background

On August 22, 2017, Mertes filed this lawsuit in Minnesota state court. (*See* Compl. [Doc. No. 1-1].) Shortly thereafter, on October 2, 2017, Defendants removed Mertes's suit to federal court. (*See* Notice of Removal [Doc. No. 1].) Defendants did this because Mertes based her case, in part, on violations of the United States Constitution. *See* 28 U.S.C. § 1331 (allowing federal courts to exercise jurisdiction over "all civil actions arising under the

Constitution . . . of the United States"); 28 U.S.C. § 1441(a) (allowing defendants to "remove" "any civil action brought in a State court of which the district courts of the United States have original jurisdiction").

In her complaint, Mertes alleged violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, at both the individual and municipal level, as well as violations of Minnesota state negligence law. (*See generally* Compl.) However, in a joint stipulation filed shortly before Defendants moved for summary judgment, Mertes voluntarily dismissed her "claims under the Fourth, Fifth, and Sixth Amendments," as well as her "Failure to Supervise, Failure to Train, and *Monell* claims." (*See* Doc. No. 45; *see also supra* n.1 (noting that Mertes agreed to dismiss *all* of her claims against Police Chief Beahen and Officer Rose, too).) Moreover, based on the parties' summary judgment briefing and the May 6, 2019 oral argument, it appears that Mertes is now only pursuing two claims: **(A)** a Fourteenth Amendment "substantive due process" claim under 42 U.S.C. § 1983, and **(B)** a Minnesota state law negligence claim under Minn. Stat. § 573.02 (the state wrongful death statute). (*See* Defs.' Summ. J. Br.; Pl.'s Br. in Opp. to Summ. J. [Doc. No. 54] ("Pl.'s Opp. Br."); Defs.' Reply Br. [Doc. No. 59].)

## II. DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, and the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the

10

nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, a party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, and must set forth specific facts in the record showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016).

### A. Section 1983 Substantive Due Process Claim

#### 1. The Law

Mertes's first claim arises under 42 U.S.C. § 1983. This provision of federal law, commonly called "Section 1983," allows victims of allegedly unconstitutional state or local government action to sue the offending government official(s) for money "damages." However, the defense of qualified immunity "protects government officials from incurring civil liability" under Section 1983 if the official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wealot v. Brooks*, 865 F.3d 1119, 1124-25 (8th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To determine if qualified immunity applies, a court must ask two questions: "(1) whether the facts the plaintiff has presented, when viewed in his favor, show that the conduct of the officer violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the incident such that a reasonable officer would have known his or her actions were unlawful." *Neal v. Ficcadenti*, 895 F.3d 576, 580 (8th Cir. 2018). Courts have discretion to decide the order in which to engage these two prongs. *See Pearson*, 555 U.S. at 236.

The constitutional right at issue here is the Fourteenth Amendment's "Due Process Clause." This Clause bars state and local government officials from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Generally speaking, the Due Process Clause exists to "protect the people from the State, not to ensure that the State protect[s] the people from each other" (or, in the case of suicide, to ensure that the State protects a person from themselves). *DeShaney v. Winnebago Cty. Dep't Soc. Servs.*, 489 U.S. 189, 196 (1989). However, under a doctrine called "substantive due process," federal courts have enunciated two narrow "exceptions" to this general rule. The ***first*** exception, which is *not* at issue here, is called the "custody exception." This law provides that, when the government "takes a person into its custody and holds him there against his will," such as when the government imprisons or institutionalizes an individual, government officials must then "assume some responsibility for [that individual's] safety and general well-being." *Id*. at 199-200; *see, e.g.*, *Ryan v. Armstrong*, 850 F.3d 419, 426 (8th Cir. 2017) (finding that county jail officers violated this law "when they allowed [a pretrial detainee] to scream, howl, and bang against his cell door for eight hours without attempting to talk to him or seek medical intervention," and the detainee died shortly thereafter).

The ***second*** exception, which *is* at issue here, is called the "state-created danger exception." This law provides that, when the government "create[s] the danger to which an individual[] [is] subjected," government officials "owe a duty to protect" that individual. *Avalos v. City of Glenwood*, 382 F.3d 792, 799 (8th Cir. 2004); *see, e.g.*, *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990) (finding that police chief violated this law when he directed his officers not to enforce a restraining order against a man because he was the

police chief's friend, despite knowing that the man posed a threat to his estranged wife, and the man then murdered his estranged wife and her friend). To establish a violation of this "state-created danger exception" a plaintiff must prove five discrete elements: (1) that they were a member of a limited, precisely identifiable group; (2) that the government official's conduct put them at a significant risk of serious, immediate, and proximate harm; (3) that the risk was known or obvious to the government official; (4) that the government official acted recklessly in conscious disregard of that risk; and (5) that, in total, the government official's conduct "shocks the conscience." *Montgomery v. City of Ames*, 749 F.3d 689, 694-95 (8th Cir. 2014). This is a very demanding standard to meet. *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (noting that, in the substantive due process context, "conscience-shocking" governmental conduct means conduct that violated the "decencies of civilized conduct," or was so "brutal and offensive that it did not comport with traditional ideas of fair play and decency") (cleaned up).

The Eighth Circuit has not had an opportunity to address this law in the specific context of "state-created" suicide. However, the general consensus among other federal courts is that government officials should rarely, if ever, be held liable under the Fourteenth Amendment for "creating" a risk of suicide. *See, e.g.*, *Cutlip v. City of Toledo*, 488 Fed. App'x 107, 115-16 (6th Cir. 2012) ("Nearly all cases that considered the state-created-danger doctrine in the context of suicide have rejected liability on the merits, finding in most cases that the municipality did not create the danger—*i.e.*, the self-destructive impulse—through an affirmative act, and in the balance of cases that the state agents did not act with deliberate indifference or in a way that shocked the conscience."). In fact, this

13

Court can only find one published decision in which a court allowed a "state-created suicide" Fourteenth Amendment claim past summary judgment. *See Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998). In that case, a special needs student committed suicide (with a firearm) after school officials sent the student home in the middle of the day, without notifying the students' parents, and despite allegedly *knowing* that the student "was suicidal and distraught, was unable to care for himself, was home alone, and . . . had access to firearms." *Id.* at 1264. However, because of *Armijo*'s unique facts, other federal courts have deemed the decision "an outlier," and have generally declined to extend it. *Jahn v. Farnsworth*, 617 Fed. App'x 453, 463 (6th Cir. 2015) (collecting cases).

   2. **Analysis**

Defendants are entitled to qualified immunity here for two reasons. ***First***, even viewing the facts in the light most favorable to Mertes, there is no evidence from which a reasonable juror could conclude that Officer Zerwas violated Capouch's Fourteenth Amendment rights. *Neal*, 895 F.3d at 580. Even assuming Officer Zerwas's threats regarding Capouch's employment placed Capouch "at a significant risk of" committing suicide, *Montgomery*, 749 F.3d at 694, there is simply no evidence in the record (a) that that risk was "known or obvious" to Officer Zerwas, (b) that Officer Zerwas "acted recklessly in conscious disregard of that risk," or (c) that Officer Zerwas's conduct "shocked the conscience," given what he knew about Capouch at the time. *Id.* Although the Court acknowledges that Officer Zerwas's colleague, Officer Rose, knew that Capouch may have been suffering from a gambling problem (*see* Pl.'s Opp. Br. at 2 (emphasizing this fact)), there is no evidence, expert

14

or otherwise, suggesting that, from that bit of information *alone*, Officer *Zerwas* should have inferred that Capouch was at risk of committing suicide.

*Second*, even if a reasonable juror could find for Mertes on the merits of her Fourteenth Amendment claim, Mertes has not pointed to any case law showing that the particular Fourteenth Amendment right at issue, *i.e.*, the right to be detained free of suicide-inducing verbal threats, was "clearly established" as of October 22, 2014, "such that a reasonable officer" in Officer Zerwas's shoes "would have known his or her [comments] were unlawful." *Neal*, 895 F.3d at 580. Without this showing, Mertes's Fourteenth Amendment claim cannot survive a qualified immunity challenge. *See Hanson v. Best*, 915 F.3d 543, 548 (8th Cir. 2019) ("[T]he plaintiff has the burden of demonstrating that the law confirming her constitutional right was clearly established.").[6]

For these reasons, the Court grants Defendants summary judgment on Mertes's Fourteenth Amendment claim under 42 U.S.C. § 1983.[7]

### B. Negligence (Minnesota State Common Law)

#### 1. The Law

Mertes also seeks to hold Defendants accountable for Capouch's death under a negligence theory. "A plaintiff who alleges negligence in a wrongful-death action must prove

---

[6] Moreover, as the Court observed above, there is only one published federal court decision allowing an analogous Fourteenth Amendment claim past summary judgment, and that case is both out-of-circuit and factually distinct. *See Armijo*, 159 F.3d at 1264.

[7] Further, because, "absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for [a] city," the Court grants summary judgment to Defendant City of Rogers on this claim, too. *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018).

(1) that the defendant had a duty [to the plaintiff], (2) that the defendant breached that duty, (3) that there was a death, and (4) that the breach of duty caused that death." *Stuedemann v. Nose*, 713 N.W.2d 79, 83 (Minn. Ct. App. 2006). Here, the critical "threshold question" is whether Officer Zerwas had a legally enforceable "duty" to protect Capouch from committing suicide, or, put differently, to take actions that would decrease the odds that Capouch would commit suicide. *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). If Officer Zerwas was not under such a "duty," questions of breach and causation become moot, as "a defendant cannot breach a nonexistent duty." *Id*. The existence of duty is a question of law for the Court. *Id*.

"Minnesota law follows the general common law rule that a person does not owe a duty of care to another – *e.g.*, to aid, protect, or warn that person – if the harm is caused by a third party's conduct." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177-78 (Minn. 2014). Accordingly, in most cases, Minnesota law does not impose wrongful death liability for suicide because the "harm" is "*self*-inflicted." *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792 (Minn. 1995). However, there are two exceptions to this rule. "The ***first*** is when there is a special relationship between a plaintiff and a defendant and the harm to the plaintiff is foreseeable," and "[t]he ***second*** is when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Fenrich v. The Blake School*, 920 N.W.2d 195, 201-02 (Minn. 2018) (emphases added) (cleaned up). Under either exception, then, the law only imposes a duty on a defendant to protect a plaintiff against suicide *if* that specific "harm" was "foreseeable." *See, e.g.*, *Sandborg v. Blue Earth Cty.*, 615 N.W.2d 61, 64-65 (Minn. 2000) (observing that, even in the "special" "jailer-detainee"

16

context, a jailer only has a duty to protect the detainee against a "*known* possibility of self-inflicted harm") (emphasis added).

"To determine whether the risk of injury to the plaintiff is foreseeable, [courts] look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Brandon*, 845 N.W.2d at 178 (cleaned up). In other words, "[t]he risk" of the particular injury "must be clear to the person of ordinary prudence." *Id*. "Foreseeability" should be decided by a court as part of its "duty" analysis in all but "close cases." *Domagala*, 805 N.W.2d at 27.

The Minnesota Court of Appeals decision, *Jasperson v. Anoka-Hennepin Indep. Sch. Dist.*, No. A-06-1904, 2007 WL 3153456 (Minn. Ct. App. Oct. 30, 2007), offers the most factually analogous application of these general legal principles.[8] That case centered around a 13-year-old student named "J.S." J.S. endured bullying and insensitive teaching throughout the fall of his eighth grade year. For instance, J.S.'s science teacher allegedly gave J.S. a failing mid-term grade and then told the young man, "your life is going nowhere," which caused J.S. to cry in class. *Id*. at *2. J.S. killed himself at his home shortly thereafter, and left a note stating, among other things, "I realize my life is going nowhere fast." *Id*. at *3. J.S.'s family sued the school district after their son's death, and argued that the school officials' failure to stop the (allegedly known) bullying, along with the science teacher's "willful and

---

[8] Although *Jasperson* is an unpublished, non-precedential opinion, this Court may still consider it as potentially "persuasive" evidence of how the Minnesota Supreme Court might treat an issue of state law. *See Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697, 703 n.5 (8th Cir. 2012).

malicious ridicule," constituted "negligence," and that that negligence "proximately caused J.S.'s suicide." *Id.*

The Minnesota District Court granted the school district's motion for summary judgment, largely on grounds that, because J.S.'s suicide was unforeseeable, "the school district did not owe a duty to J.S. to prevent him from committing suicide." *Id.* at *4. The Minnesota Court of Appeals affirmed. In so ruling, the Court of Appeals first observed that "the record [did] not support [the family's] assertions that any school personnel knew or had reason to know that J.S. continued to have problems with [bullying] after September 18 [a few weeks before J.S. committed suicide], that J.S.'s failing grades were caused by his terror of the [bullying], or that [the school guidance counselor] told J.S. that she did not have time to meet with him." *Id.* at *5. "[G]iven the evidence in this case," the Court of Appeals then held, the four schoolteacher defendants "could not have foreseen any harm to J.S. and therefore had no duty to protect him from such harm." *Id.*

### 2. Analysis

As the Court noted above, it is undisputed that, over the course of Capouch's roughly hour-long arrest and detainment, Capouch did not engage in any behavior that would have suggested to a reasonable police officer that he was at risk of committing suicide. (*See supra* at 8.) It is also undisputed that the Officers had no information within their possession that would have put them on notice of that risk. (*Id.*) Capouch's suicide was accordingly unforeseeable as a matter of law, just as the suicide at issue in *Jasperson*. Consequently, under the circumstances, the law imposed no duty on Officer Zerwas to modify his (arguably threatening) comments so as to protect Capouch from the threat of suicide. *See Fenrich*, 920

18

N.W.2d at 201-02. And, because "a defendant cannot breach a nonexistent duty," *Domagala*, 805 N.W.2d at 22, it is of no moment that Mertes has submitted evidence showing that Officer Zerwas (allegedly) acted negligently toward Capouch when he threatened his employment (*see* Montgomery Ex. Rep. at 23 [Doc. No 49-14] (opining that Officer Zerwas's comments during Capouch's detention were "not what reasonably-trained and prudent police officers typically do in situations [like that]")), and that that negligence (allegedly) constituted the "primary factor" behind Capouch's death (*see* Willenbring Ex. Rep. at 3 (opining that Officer Zerwas's "egregious" and "unwarranted" "threats" to Capouch's employment were "a substantial factor, if not the primary factor, in driving [Capouch] to commit suicide")).

Moreover, although Mertes argues in her brief that the issue of "foreseeability" is "close," and should therefore be presented to a jury, the two Minnesota Supreme Court cases she cites in support of that assertion are wholly inapposite. *See Senogles v. Carlson*, 902 N.W.2d 38, 47 (Minn. 2017) (denying summary judgment in negligent supervision drowning case, and noting that there were "disputed facts regarding [plaintiff's] experience and differing reasonable inferences about whether the danger of returning to the river should have been obvious to [the plaintiff]"); *Montemayor v. Sebright Prods., Inc.*, 898 N.W.2d 623, 631-32 (Minn. 2017) (denying summary judgment in products liability case, and noting that "a reasonable person could find that [defendant company] should have foreseen the possibility of a worker operating the [at-issue machine] from the control panel without the ability to observe another worker performing maintenance inside the machine").

For these reasons, the Court grants Defendants summary judgment on Mertes's negligence claim under Minn. Stat. § 573.02.[9]

### III. ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 46] is **GRANTED**. **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  July 23, 2019                                   **/s/ Susan Richard Nelson**
SUSAN RICHARD NELSON
United States District Judge

---

[9] Because Mertes does not allege any direct negligence on the City of Rogers's part, and because the City cannot be vicariously liable for a tort its employee did not commit, the Court grants Defendant City of Rogers summary judgment on this claim, too.